1
2
3
4

UNITED STATES DISTRICT COURT

5

NORTHERN DISTRICT OF CALIFORNIA

6

7   YANCY CUMMINGS, et al.,                    Case No.  15-cv-04723-JCS

Relator,

8

v.                              **REPORT AND RECOMMENDATION**
9                                                  **REGARDING MOTION FOR DEFAULT**
                                                **JUDGMENT**
10   MARY E. BRANTLEY HALE,
                                                Re: Dkt. No. 53
Defendant.

11

12   **I.      INTRODUCTION**

13          Relator Yancy Cummings brings this qui tam action on behalf of the United States against

14   Cummings's former landlord, Defendant Mary E. Brantley Hale, for accepting housing subsidy

15   payments for which Hale was not entitled.  Cummings also brings a number of state law claims on

16   her own behalf against Hale for Hale's mistreatment and constructive eviction of Cummings.

17   Hale has not answered the complaint or otherwise appeared, and Cummings now moves for

18   default judgment.  The undersigned magistrate judge held a hearing on March 3, 2017, after which

19   Cummings submitted supplemental materials.  For the reasons discussed below, the undersigned

20   recommends that Cummings's motion be GRANTED in part and DENIED in part, and that

21   judgment be entered against Hale in favor of the United States in the amount of $174,174 and in

22   favor of Cummings in the amount of $386,021.

23          This action will be reassigned to a United States district judge for all further proceedings,

24   including action on the recommendations herein.  Any party may file objections to these

25   recommendations no later than May 31, 2017.

26   **II.     BACKGROUND**

27          **A.      Section 8 Housing Choice Voucher Program**

28          Because Cummings's only federal claim alleges that Hale submitted false claims under the

United States District Court
Northern District of California

Section 8 Housing Choice Voucher program ("Section 8 Program"), a brief overview of the relevant components of the program is useful starting point.[1]  The Section 8 Program is administered by state or local governmental entities known as public housing agencies ("PHAs"). 24 C.F.R. § 982.1(a).  The PHAs receive funding from the U.S. Department of Housing and Urban Development ("HUD"), which the PHAs use to provide financial assistance to enable eligible families to afford decent, safe, and sanitary housing.  *Id.*  The Section 8 Program provides either "tenant-based" or "project-based" financial assistance.  *Id.* § 982.1(b)(1).  Only tenant-based assistance is at issue in this case.

To receive tenant-based assistance, an eligible family conducts a housing search and selects a rental unit.  *Id.*  § 982.1(b)(2).  The family then applies to the PHA for approval of its tenancy in the rental unit by submitting a Request for Tenancy Approval form, including a copy of the lease and the HUD-prescribed Tenancy Addendum.  *See id.* § 982.302.  To approve the request, the PHA must determine that the rent is reasonable and that the unit and lease meet certain requirements.  *Id.* § 982.305.

After the PHA approves the tenancy, the responsibility to pay rent is divided between the family and the PHA.  *Id.* § 982.1(b)(2).  The family's payment amount is determined based on family income and the PHA's schedule of payment standards for the rental unit's size and market area—or the unit's actual rent, if lower than the payment standard.  *See id.* §§ 982.503, 982.505, 982.515.  The PHA's calculation of the total amount that the family pays includes any portion of the utility bills for which the family will pay.  *See id.* §§ 982.4, 982.515.

To pay its portion of the rent, the PHA enters into a housing assistance payments ("HAP") contract with the unit's owner to make rent subsidy payments on behalf of the family.  *Id.* § 982.1(a)(2).  The HAP contract must be in a form specified by HUD and must indicate the total amount of rent the owner will receive from the sum of payments by the PHA and tenant.  *Id.*

---

[1] *See generally* U.S. Dep't of Hous. & Urban Dev, Housing Choice Voucher Program Guidebook (April 2001), *available at* http://portal.hud.gov/hudportal/HUD?src=/program_offices/public_indian_housing/programs/hcv/forms/guidebook.

United States District Court
Northern District of California

§ 982.451(a)(1).  If the owner receives payment in excess of this amount, the owner must immediately return the excess payment to whichever party paid too much.  *Id*. § 982.451(b)(3)−(4).

### B.   Allegations of the Complaint

#### 1.   Factual Allegations[2]

Cummings and her two children lived in an apartment owned by Hale at 2814 Ingalls Avenue in San Francisco, California, from July 26, 2013 until August 3, 2015.  Compl. ¶¶ 9, 10, 19.  The apartment was "Unit A" in a single family house that had been divided into two units.  *Id.* ¶ 9.  Cummings's tenancy in the apartment was subsidized through the Section 8 Program.  *See id.*

In order to establish the tenancy's eligibility for the Section 8 Program, Cummings and Hale signed a Request for Tenancy Approval, which was submitted to the San Francisco Housing Authority (the "Housing Authority")[3] on June 5, 2013.  *Id.* ¶ 20.  According to the allegations of the complaint, the Request for Tenancy Approval stated that Hale "would be financially responsible for all utility costs resulting from the proposed tenancy."  *Id.*  The Request for Tenancy Approval is attached to the Cummings's complaint as Exhibit A.

Around the same time, Cummings and Hale entered into a written rental agreement (the "Lease") for the rental unit, which provided that the monthly rent would be $2,434.  *Id.* ¶¶ 21–23.  The Lease is attached to the complaint as the first four pages of Exhibit B.  In order to receive housing assistance payments, Hale and the Housing Authority entered into a HAP contract, which is attached to the complaint as the second document in Exhibit B (the "HAP Contract").  *Id.* ¶ 22.  The HAP contract stated that Hale "agreed to pay for all utility and garbage service" for the apartment.  *Id.*

Once Cummings moved into the apartment, however, Hale "refused to pay for any portion of the utility or garbage service."  *Id.* ¶ 24.  Instead, Cummings paid for the utility and garbage

---

[2] As discussed below, a plaintiff's allegations are generally taken as true on a motion for default judgment, except as to damages.

[3] The San Francisco Housing Authority is the PHA for the city of San Francisco.  *See* http://portal.hud.gov/hudportal/HUD?src=/program_offices/public_indian_housing/pha/contacts/ca.

United States District Court
Northern District of California

service for both units—the unit she was renting and also Unit B, which she was not renting—as the property had only a single electricity meter and shared waste disposal containers. *Id.*  Hale never offered to reimburse Cummings for cost of utility or garbage service. *Id.*  Copies of records of Cummings's payments to the utility provider, Pacific Gas and Electric ("PG&E"), and the garbage service provider, Recology, are attached to the complaint as Exhibit C. *Id.* ¶ 24 & Ex. C.

By July of 2015, PG&E had scheduled to shut off utility service at the property because Cummings was unable to pay the utility bills. *Id.* ¶ 31.  Although the property would be uninhabitable without utility service, Cummings was unable to convince Hale to reimburse her for utility payments. *Id.*  Cummings therefore insisted on a meeting with one of Hale's agents and Latanya Harris, a Section 8 Program administrator for the Housing Authority, on July 20, 2015. *Id.*  At the meeting, Harris told Hale's agent that requiring Cummings to pay for utilities violated the Lease and the HAP Contract and that Hale and her agents were thus committing fraud, but Hale took no action in response. *Id.*  Utility service to the property was shut off on July 23, 2015, at which point Cummings left the property. *Id.* ¶ 33.  Cummings removed her possessions from the apartment by August 3, 2015. *Id.*

Cummings details a number of defects and substandard conditions in the apartment during her tenancy.  The property had been illegally converted into two units, resulting in inadequate ceiling height and unapproved wiring and plumbing. *Id.* ¶ 28.  In October of 2013, faulty sewage piping caused raw sewage to leak into Unit B of the property. *Id.* ¶ 27.  In April of 2014, water intrusion caused the ceiling of the storage room to collapse, and neither the water intrusion nor the ceiling was repaired. *Id.* ¶ 29.  By February of 2015, plumbing problems caused the apartment to smell of sewage, and there were "contaminants on the kitchen window." *Id.* ¶ 30.  By the time Cummings vacated the apartment, other defects included contaminants in the kitchen, bathroom, and front bedroom; inadequate smoke and carbon monoxide detectors; damaged floors and walls in certain areas; and "infestations of cockroaches, rodents and raccoons." *Id.* ¶¶ 32, 36.  Cummings further alleges that surface and airborne contaminants had destroyed some of her family's clothing, furniture, and other possessions. *Id.* ¶ 40.

Hale was notified of or cited for many of these defects following building inspections.  An

4

inspector from the Housing Authority cited Hale for "numerous defective conditions" in an inspection report dated July 25, 2013. *Id.* ¶ 25 & Ex. D. Inspector Luton of the San Francisco Department of Building Inspection visited the apartment in October of 2013 and issued Hale a Notice of Violation and abatement order related to the sewage leak. *Id.* ¶ 27. In November of 2014, Inspector Luton issued Hale an additional Notice of Violation related to the illegal separation of the property into two units; Hale never remedied the violation. *Id.* ¶ 28. Finally, on August 3, 2015, Inspector Wu of the San Francisco Department of Building Inspection issued a Notice of Violation for inadequate smoke and carbon monoxide detectors, water intrusion, contaminants, and damaged floors, walls, and ceilings. *Id.* ¶ 32.

### 2. Legal Claims

Cummings asserts a single federal law claim under the False Claims Act ("FCA"), 31 U.S.C. §§ 3729−33, alleging that Hale violated her HAP Contract with the Housing Authority by forcing Cummings to pay for utility and garbage service, when the HAP Contract provided that Hale would pay for those services. Compl. ¶ 66. Because Hale's receipt of funds through the Section 8 Program was conditioned on Hale paying for these services under the HAP Contract, and because the Housing Authority receives federal funds from HUD to make payments under HAP contracts, Cummings contends that Hale's receipt of payment under the HAP Contract amounts to a false claim submitted to the federal government. *Id.* ¶¶ 68, 71.

The Complaint also asserts sixteen claims under state and local law. These claims arise generally out of two interrelated sets of facts. One set of claims arises primarily from Hale's alleged misrepresentation about the payment of utility and waste services. These claims include fraud (Claim 2, *id.* ¶¶ 76−82), receipt of property obtained through theft or extortion in violation of California Penal Code section 496 (Claim 3, *id.* ¶¶ 83−85), improper utility metering in violation of California Civil Code section 1940.9 (Claim 13, *id.* ¶¶ 138−40), breach of contract (Claim 15, *id.* ¶¶ 146−50), and unlawful rent increase in violation of San Francisco Administrative Code section 37.3 (Claim 17, *id.* ¶¶ 155−60).

The second set of claims arises primarily from the condition of the apartment and Hale's treatment of Cummings as a tenant. These claims include breach of covenant of quiet enjoyment

5

(Claim 4, *id.* ¶¶ 86−90), failure to return security deposit in violation of California Civil Code section 1950.5 (Claim 5, *id.* ¶¶ 91−94), unlawful business practices in violation of California Business and Professions code section 17200 (Claim 6, *id.* ¶¶ 95−103), constructive eviction (Claim 7, *id.* ¶¶ 104−08), recovering possession of a rental unit in violation of San Francisco Administrative Code section 37.9 (Claim 8, *id.* ¶¶ 109−14), intentional infliction of emotional distress (Claim 9, *id.* ¶¶ 115−17), negligence (Claim 10, *id.* ¶¶ 118−23), nuisance (Claim 11, *id.* ¶¶ 124−28), breach of the implied warranty of habitability (Claim 12, *id.* ¶¶ 129−37), tenant harassment in violation of San Francisco Administrative Code section 37.10B (Claim 14, *id.* ¶¶ 141−45), and collection of rent from an untenantable dwelling in violation of California Civil Code section 1942.4 (Claim 16, *id.* ¶¶ 151−54).  Some claims relate to both the utilities payments and the condition of the apartment. *See, e.g.*, *id.* ¶ 106 (alleging that Hale's failure to pay utility bills after service was cut off contributed to Cummings's constructive eviction); *id.* ¶¶ 148−49 (alleging that Hale breached the HAP contract both by forcing Cummings to pay for utilities and by failing to make needed repairs).

## C.    Motion for Default Judgment

Cummings's present motion pursues the following theories of liability: (1) negligence, Mot. at 10; (2) breach of the implied warranty of habitability, *id.* at 10−12; (3) unlawful business practices, *id.* at 12; (4) violation of Civil Code section 1942.4, *id.* at 12−14; (5) nuisance, *id.* at 14; (6) breach of the covenant of quiet enjoyment, *id.* at 15; (7) breach of the covenant of good faith and fair dealing, *id.*; (8) constructive eviction, *id.* at 15−16; (9) violation of the FCA, *id.* at 16−17; (10) fraud and violation of Penal Code section 496, *id.* at 17; (11) violation of Civil Code section 1950.5, *id.* at 17−18; and (12) violation of San Francisco Administrative Code section 37.10(B), *id.* at 18−19.

The motion does not specifically address Cummings's claims for improper metering under Civil Code section 1940.9, *cf.* Compl. ¶¶ 138−40, breach of contract (except with respect to the implied covenants discussed above), *cf. id.* ¶¶ 146−50, unlawful rent increase under San Francisco

Administrative Code section 37.3, *cf. id.* ¶¶ 155−60, unlawful eviction under section 37.9, *cf. id.* ¶¶ 109−14, or intentional infliction of emotion distress,[4] *cf. id.* ¶¶ 115−17.

Cummings's motion is supported by her own declaration (Cummings Decl., dkt. 53-19), a declaration by her counsel Jason Hain attaching a number of exhibits (Hain Decl., dkt. 53-1), and a request for judicial notice of certain public records and court documents (RJN, dkt. 53-17). After the hearing, Cummings submitted a supplemental brief (Supp'l Br., dkt. 61), a supplemental declaration by Hain (Hain Supp'l Decl., dkt. 61-2), a declaration by attorney Robert Smith attesting to the reasonableness of Hain's billing rate (Smith Decl., dkt. 61-1), a supplemental request for judicial notice (Supp'l RJN, dkt. 61-3), and Cummings's own supplemental declaration (Cummings Supp'l Decl., dkt. 61-4). Although Cummings indicated in her supplemental declaration that she "decided that circumstances did not justify retaining an expert to appraise the future market increases in the subject premises' rental value," *id.* ¶ 10, she submitted a short expert declaration by Richard Devine (Devine Decl., dkt. 64) several days later. Evidence that the undersigned finds relevant to the present motion is discussed in more detail below in the analysis of Cummings's claims.

## III.    ANALYSIS

### A.    Preliminary Considerations

#### 1.    Jurisdiction

This Court has jurisdiction over Cummings's FCA claim pursuant to 28 U.S.C. § 1331, because the claim arises under the laws of the United States, and pursuant to 31 U.S.C. § 3732(a), which specifically provides district courts with jurisdiction over actions under the FCA. The undersigned finds Cummings's state law claims—all of which arise out of Cummings's tenancy—to be sufficiently related to her federal claim to fall within the Court's supplemental jurisdiction under 28 U.S.C. § 1367. As for personal jurisdiction, the undersigned finds that by engaging in

---

[4] The motion discusses emotion distress damages, *see* Mot. at 20, but does not include the tort of intentional infliction of emotion distress in its discussion of Cummings's claims, *see id.* at 10−19, nor does it address the elements of such a claim under California law or whether Cummings has established those elements here.

United States District Court
Northern District of California

the business of leasing out real estate in California, Hale both purposefully directed her activities towards California and purposefully availed herself of the privileges of doing business in California, and therefore falls within this Court's jurisdiction for claims based on that conduct.

### 2. Adequacy of Service

Courts must determine the adequacy of service of process on a motion for default judgment. *Bank of the West v. RMA Lumber Inc.*, No. 07-6469 JSW, 2008 WL 2474650, at *2 (N.D. Cal. June 17, 2008). On September 13, 2016, the undersigned issued an order denying without prejudice a motion by Cummings to permit service by publication. *See* Order Re Service by Publication (dkt. 34).[5] For the reasons discussed in that order, the undersigned found Cummings's efforts to serve Hale—which included contracting with investigative services to determine possible addresses for Hale, directing the United States Marshals Service to attempt to serve Hale at the most promising of those addresses, and speaking to Hale's daughter, who refused to provide a current address for Hale—to be sufficient to warrant service by publication. *Id.* at 3–4. Because Cummings had not provided an affidavit as required by California law, however, the undersigned denied the motion without prejudice. *Id.* at 4–5. Cummings subsequently filed the required affidavit with a renewed motion to permit service by publication, dkt. 37, the undersigned granted that motion, dkt. 38, and Cummings served Hale by publication in a manner consistent with the order granting her motion, dkt. 40. The undersigned therefore finds that Hale has been properly served pursuant to section 415.50(a) of the California Code of Civil Procedure.

### B. Legal Standard for Entry of Default Judgment

After default has been entered against a party, a district court may grant an application for default judgment in its discretion. *See* Fed. R. Civ. P. 55(b)(2). If the court is satisfied that jurisdiction is proper and that service of process was adequate, it then considers several factors in determining whether to grant default judgment:

> (1) the possibility of prejudice to the plaintiff, (2) the merits of plaintiff's substantive claim, (3) the sufficiency of the complaint,

[5] *Cummings v. Brantley Hale*, No. 15-cv-04723-JCS, 2016 WL 4762208 (N.D. Cal. Sept. 13, 2016).

1

(4) the sum of money at stake in the action, (5) the possibility of a
dispute concerning material facts, (6) whether the default was due to
excusable neglect, and (7) the strong policy underlying the Federal
Rules of Civil Procedure favoring decisions on the merits.

2

3    *Eitel v. McCool*, 782 F.2d 1470, 1471−72 (9th Cir. 1986).  In making its decision, the court takes

4    all factual allegations in the complaint, except those relating to damages, as true.  *TeleVideo Sys.,*

5    *Inc. v. Heidenthal*, 826 F.2d 915, 917−18 (9th Cir. 1987) (citing *Geddes v. United Fin. Grp.*, 559

6    F.2d 557, 560 (9th Cir. 1977)); *see also* Fed. R. Civ. P. 8(b)(6) ("An allegation—other than one

7    relating to the amount of damages—is admitted if a responsive pleading is required and the

8    allegation is not denied.").

9        **C.    *Eitel* Factors**

10            Several of the *Eitel* factors weigh in favor of granting default judgment simply by virtue of

11    the fact that Hale has not participated in this action.  Because Hale has failed to respond to the

12    complaint or otherwise appear in this action, Cummings will be left without a remedy, and

13    therefore prejudiced, if default judgment is not granted.  In light of Cummings's extensive efforts

14    to serve Hale—including contacting Hale's daughter, who told Cummings's counsel that she

15    would inform Hale of the lawsuit—there is no indication that Hale's default is due to excusable

16    neglect.  Hale could conceivably dispute some of the material facts if she were to appear, but she

17    has failed to do so.  Finally, while there is a strong public policy favoring the resolution of

18    disputes on the merits, that is not possible in this case because Hale has failed to appear and there

19    is no indication that she intends to do so.

20            The factors addressing "the merits of plaintiff's substantive claim" and "the sufficiency of

21    the complaint" are intertwined where, as here, the case has not advanced beyond the pleading

22    stage.  The merits and sufficiency of Cummings's claims are discussed separately below.  To the

23    extent that "the sum of money at stake" is a relevant factor where a defendant has not appeared or

24    responded to a complaint, the undersigned considers it in the context of whether Cummings has

25    adequately shown that she is entitled to the damages she seeks, as also discussed below.

26        **D.    False Claims Act**

27            **1.   Sufficiency of Claim**

28            Any person who knowingly submits a false claim to the United States government is liable

for three times the damages sustained by the United States, as well as a civil penalty of no less than $5,000 and no more than $10,000.  31 U.S.C. § 3729(a).  A person acts "knowingly" within the meaning of the FCA if that person "(i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information."  *Id.* § 3729(b)(1)(A).  The term "knowingly" in this context "requires no proof of specific intent to defraud."  *Id.* § 3729(b)(1)(B).  A private person may bring an action under the FCA as a qui tam relator on behalf of the United States and, if the United States declines to intervene, may receive no less than twenty-five percent and no more than thirty percent of any recovery, plus reasonable costs and attorneys' fees.  *Id.* § 3730(b), (d)(2); *see, e.g.*, *Ebeid ex rel. United States v. Lungwitz*, 616 F.3d 993, 995 (9th Cir. 2010).  A claim under the FCA may be brought up to six years after the violation occurred, or later in some circumstances based on delayed discovery of relevant facts.  31 U.S.C. § 3731(b).

A typical claim under the FCA involves a claim for payment that is "literally false or fraudulent," such as a claim by a private company that overcharges the federal government under a government contract.  *United States ex rel. Hendow v. Univ. of Phoenix*, 461 F.3d 1166, 1170 (9th Cir. 2006).  However, a plaintiff may also bring an FCA claim based on false certification, where the claimant falsely certifies that it has met one of the preconditions to obtaining a government benefit.  *Id.* at 1171.  To plead a claim under the FCA based on false certification, a plaintiff must adequately allege "(1) a false statement or fraudulent course of conduct, (2) made with scienter, (3) that was material, causing (4) the government to pay out money or forfeit moneys due."  *See id.* at 1174.

Cummings contends that Hale violated the FCA by receiving federal housing subsidies for Cummings's tenancy despite violating the terms of her agreement with the Housing Authority— specifically, the provisions requiring Hale to pay for utilities and setting the limited amount of rent for which Cummings would be responsible.  Several courts confronted with similar claims have held that a landlord's acceptance of Section 8 subsidies while failing to abide by the terms of an HAP contract can give rise to a claim under the FCA.  *See, e.g.*, *United States ex rel. Holmes v. Win Win Real Estate, Inc.*, No. 2:13-CV-02149-APG-GWF, 2015 WL 6150594 (D. Nev. Oct. 19,

United States District Court
Northern District of California

2015) (granting summary judgment for the plaintiff on the basis that a landlord charged a tenant improper "side payments" in the form of homeowners' association and property management fees); *United States ex rel. Sutton v. Reynolds*, 564 F. Supp. 2d 1183 (D. Ore. 2007) (denying summary judgment for the defendant where the evidence could show that the defendant landlord sought to collect an additional $30 "for increased taxes and utilities" beyond the rent specified in the HAP contract).

The Central District of California considered a motion for default judgment under similar circumstances in *United States v. Baran*:

> In the Ninth Circuit, a party can sufficiently establish the first element under a theory of express or implied false certification. . . . Here, Defendant certified the following when she entered into the HAP Contract with HACLA: (1) that she had not received and would not receive any payments or other consideration for the rental during the HAP contract term, except for the rent she was entitled to under the HAP Contract; (2) in the event that she did receive any excess rent payments from the tenant, she would return it immediately; and (3) if she failed to comply with any provision of the HAP Contract, she did not have the right to receive housing assistance payments under the HAP Contract. However, Defendant collected monthly subsidies from the public housing agency while simultaneously receiving excess side rent payments from the Plaintiff in violation of the requirements set forth in the HAP Contract. The Court finds that Plaintiff has sufficiently alleged a false statement based on a theory of implied false certification.
>
> Next, Plaintiff must establish that the false certification was made with scienter. The scienter requirement is critical to the operation of the FCA and to the resolution of any claims brought within it. *U.S. ex rel. Hochman v. Nackman,* 145 F.3d 1069, 1073 (9th. Cir. 1998). In order not to punish honest mistakes or incorrect claims submitted through mere negligence, Congress specifically amended the FCA to include scienter. *Id.* The FCA defines "knowing" and "knowingly" as having actual knowledge of the information, or acting in either deliberate ignorance to or reckless disregard for the information's truth or falsity. 31 U.S.C. § 3729(b)(1)(A). The Ninth Circuit has further explained that the requisite scienter is "the knowing presentation of what is known to be false," and that the false statement or fraudulent conduct must be made with knowledge of the falsity and with intent to deceive. *Hochman,* 145 F.3d at 1073; *Hendow,* 461 F.3d at 1172.
>
> When Defendant executed the HAP Contract, she explicitly agreed to comply with the provisions therein. Therefore, Defendant knowingly violated the HAP Contract when she demanded and received side rent payments from Plaintiff while simultaneously receiving housing assistance payments. Plaintiff has alleged sufficient facts to plausibly infer that Defendant made false

certifications with the requisite scienter, resulting in violation of the FCA.

The third element requires that "false statement or course of conduct must be material to the government's decision to pay out moneys to the claimant." *Ebeid*, 616 F.3d at 997. Establishing this element hinges on whether the false certification was relevant to the government's decision to confer a benefit. *Id.* Under the false certification theory, materiality is only satisfied where compliance with a law, rule or regulation is "a *sin qua non* of receipt of state funding." *Id*. at 998.

The HAP Contract that Defendant and HACLA entered into explicitly states that the owner of the rental property does not have a right to receive housing assistance payments under the HAP Contract unless the owner has complied with all provisions therein. Therefore, Defendant's false certification that she was not receiving any additional payments or consideration for the rental property was material to the government's decision to pay out moneys. Plaintiff has sufficiently alleged materiality.

Lastly, Plaintiff must show that there was an actual *claim,* meaning that the government paid out moneys or forfeited moneys due. *Hendow*, 461 F.3d at 1173. Defendant collected the HAP subsidy from the HACLA for the subject premises every month from October 2009 through September 2013, thereby receiving government moneys. Plaintiff has successfully alleged the fourth element of the FCA.

. . .

Based on the foregoing facts, the Court finds that the Plaintiff has adequately alleged violation of the FCA. The second and third *Eitel* factors weigh in favor of granting default judgment on Plaintiff's FCA claim against Defendant.

*United States v. Baran*, No. CV 14-02639 RGK (AJWx), 2015 WL 5446833, at *4–5 (C.D. Cal. Aug. 28, 2015).

Here, as in *Baran*, Hale agreed to a number of terms of the HAP Contract that she did not ultimately honor.  Cummings focuses on the second page of the contract, which states that "Owner" shall pay for certain categories of appliances and utilities, including natural gas (for heating, cooking, and hot water), "Trash Collection," and "Other Electric."[6]  HAP Contract at 2.

---

[6] The undersigned notes that the lease agreement between Hale and Cummings includes a provision stating that "Tenants pay for all trash removal."  Lease at 4.  This statement does not change the FCA analysis for a number of reasons.  First, nothing in the lease contradicts the HAP Contract's requirement that the owner pay for electricity, Hale's violation of which would in itself be sufficient treat her receipt of Section 8 funds as false claims.  Second, neither the federal

United States District Court
Northern District of California

United States District Court
Northern District of California

1   Also as in *Baran*, the HAP Contract here provides that "[u]nless the owner has complied with all

2   provisions of the HAP contract, the owner does not have a right to receive housing assistance

3   payments under the HAP contract."  HAP Contract at 4, § 7(b).  Hale nevertheless required

4   Cummings to pay garbage and utility bills, with the exception of a single reimbursement of $45

5   from Hale and reimbursement of $100 from the occupant of the illegal second unit.  Cummings

6   Decl. ¶ 9.  Hale continued to accept subsidy payments for Cummings's tenancy.  *See* Compl. ¶ 72.

7   As in *Baran*, the undersigned "finds that [Cummings] has sufficiently alleged a false statement

8   based on a theory of implied false certification."  *See Baran*, 2015 WL 5446833, at *4.

9   Turning to the second element, scienter, the same facts that the *Baran* court found

10  sufficient are also present here—Hale signed an HAP contract explicitly conditioning her receipt

11  of Section 8 funds on certain requirements, and continued to receive those funds despite violating

12  those conditions.  *See id.* at *5; *see also Sutton*, 564 F. Supp. 2d at 1188 (concluding that the

13  scienter requirement was satisfied because "Defendant's failure to advise [the PHA] that he was

14  collecting additional rents could be considered a misrepresentation by omission and could

15  constitute a knowing and intentional fraud on the government").  The complaint here also

16  specifically alleges that Hale represented that she would pay for utilities in order to "fraudulently

17  induce [Cummings] and the Government to believe that [Hale] would pay for all garbage and

18  utility services . . . while [Hale] knew that [Cummings] would be charged for [Cummings's] own

19  garbage and utility usage as well as all garbage and utility usage of another tenant."  Compl. ¶ 71.

20  The fact that Hale continued to refuse to pay for utilities after a Section 8 program administrator

21  informed Hale's agent that Hale was violating the HAP Contract and committing fraud by failing

22  to do so, *see* Compl. ¶ 31, Cummings Decl. ¶ 12, also tends to reinforce the conclusion that her

23  violation of the HAP Contract was "knowing" within the meaning of the FCA.  The undersigned

24

25  government nor the local PHA was a party to the lease agreement, and those entities therefore did
    not consent to Hale making Cummings responsible for garbage collection costs when they agreed
26  to provide Section 8 funds to Hale.  Third, the HAP Contract provides that "[t]he lease shall be
    consistent with the HAP contract" with respect to which party is responsible for utility payments,
27  and Hale's use of a lease agreement that purported to make Cummings responsible for garbage
    payments was therefore itself a violation of the HAP Contract that would disqualify Hale from
28  receiving Section 8 funds.  *See* HAP Contract at 4, § 5(a)−(c).

13

therefore finds the scienter element to be satisfied here.

Third, with respect to materiality, the undersigned agrees with the *Baran* court that by stating that "[u]nless the owner has complied with *all* provisions of the HAP contract, the owner does not have a right to receive housing assistance payments," the HAP Contract renders any breach of its terms material to a landlord's right to receive payments.  HAP Contract at 4, § 7(b); *see Baran*, 2015 WL 5446833, at *5.

Finally, taking as true the allegation that Hale "continued to receive subsidy payments from the Government," Compl. ¶ 72, Cummings has sufficiently established that Hale "caus[ed] the government to pay out money," thus satisfying the fourth element for an FCA claim.  *See Hendow*, 461 F.3d at 1174; *Baran*, 2015 WL 5446833, at *5.  The undersigned therefore recommends that default judgment be GRANTED as to this claim.

### 2.  Damages

A person who violates the False Claims Act "is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 . . . plus 3 times the amount of damages which the Government sustains because of the act of that person."  31 U.S.C. § 3729(a)(1).  The civil penalties have been adjusted for inflation to no less than $5,500 and no more than $11,000 per violation occurring on or before November 2, 2015.[7]  28 C.F.R. § 85.3(a)(9).

#### a.  Civil Penalties

Other courts considering FCA claims based on noncompliance with Section 8 HAP contracts have treated each payment as a separate violation for the purpose of assessing civil penalties.  *Baran*, 2015 WL 5446833, at *8; *Coleman v. Hernandez*, 490 F. Supp. 2d 278, 281 (D. Conn. 2007); *see also United States v. Mackby*, 339 F.3d 1013, 1017 (9th Cir. 2003) (holding that each of the 8,499 instances in which the defendant "used a false Medicare PIN number to procure Medicare payments for which he was not eligible" constituted a separate violation of the FCA).

---

[7] The adjusted penalty is substantially higher for violations occurring after that date, *see* 28 C.F.R. § 85.5, but Cummings vacated the premises at issue in August of 2015, Cummings Decl. ¶ 15, and there is no indication that Hale collected Section 8 payments after November of that year.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    Here, Cummings occupied the premises from July 26, 2013 until early August of 2015.  There is

2    evidence to show that Hale continued to receive Section 8 payments as late as July of 2015,

3    twenty-four months after Cummings moved in.  *See* Cummings Decl. ¶ 12 (stating that at a

4    meeting on July 20, 2015, a Section 8 administrator informed Hale's agent that Hale "was

5    committing fraud" by requiring Cummings to pay for utilities).  The undersigned therefore agrees

6    with Cummings's assertion that—subtracting three months to account for the one-time

7    reimbursements of $45 and $100 that Cumming received from Hale and the occupant of the other

8    unit[8]—the evidence indicates that Hale received Section 8 payments for twenty-one months in

9    which Hale required Cummings to pay for utilities.  *See* Mot. at 27.  Although Cummings requests

10    the maximum civil penalties for those false claims, and the undersigned is cognizant that Hale has

11    not appeared in this action to present any argument why the penalty should be lower, the

12    undersigned finds that a penalty of $5,500 per violation, totaling $115,500, would be more

13    proportional to the misconduct at issue[9] while remaining sufficient to accomplish the statute's

14    purpose of deterrence.

15                   b.  <u>Treble Damages</u>

16          As for determining the actual damages sustained by the government, "[o]rdinarily the

17    measure of the government's damages [under the FCA] would be the amount that it paid out by

18    reason of the false statements over and above what it would have paid if the claims had been

19    truthful."  *United States v. Mackby*, 339 F.3d 1013, 1018 (9th Cir. 2003) (quoting *United States v.*

20    *Woodbury*, 359 F.2d 370, 379 (9th Cir. 1966)) (alteration in original).  The *Baran* and *Coleman*

21    decisions—both of which cite the rule set forth in *Mackby*—present two conflicting approaches to

22    determining this amount where a Section 8 landlord requires a tenant to pay more than the amount

23

24    [8] Cummings states in her declaration that, after subtracting those reimbursements, she paid
$3,094.22 for utilities during her tenancy, Cummings Decl. ¶ 13, indicating that she paid a total of

25    $3,239.22 over a twenty-four month period.  The $145 she received as reimbursement represents
approximately 4% of the total she paid.  Cummings's proposal to forego penalties for three

26    months—12.5% percent of the time that Cummings occupied the premises—is therefore a
conservative approach that tends to favor Hale.  The undersigned finds this deduction to be

27    reasonable.
[9] The undersigned notes that Cummings bases her FCA claim solely on Hale requiring Cummings

28    to pay for utilities, and not on any other conditions of the premises.

prescribed by an HAP contract.  In *Baran*, the Central District of California reasoned that, "[h]ad Defendant been truthful about the extra payments she was receiving from Plaintiff, the government would not have distributed those monthly payments," and damages should therefore be based on the entire amount paid by the government.  *Baran*, 2015 WL 5446833, at *8.  In *Coleman*, however, the District of Connecticut concluded that because the landlord collected an extra $60 per month from the tenant, "the government, in effect, paid out an extra $60 on each of six occasions, because [the landlord] was improperly obtaining that $60 from" the tenant, and "[h]ad the rental subsidy claims been truthful, the government would have paid $60 less than it did on each of six occasions."  *Coleman*, 490 F. Supp. 2d at 281.

It is not clear how the *Coleman* court reached the conclusion that "the government would have paid $60 less than it did" if it had known about the side payments.  *See id.*  The undersigned is not aware of any PHA's practice of reducing Section 8 subsidies in amounts corresponding to side payments made by the beneficiary tenants.  To the contrary, the Section 8 Program sets the tenant's and PHA's shares of rent payments based on the tenant's income and the PHA's schedule of payment standards for the rental unit's size and market area.  24 C.F.R. §§ 982.503, 982.505, 982.515.  A landlord who requires a Section 8 tenant to pay a certain amount more than her prescribed share of the rent does not merely deprive the government of that amount of value, but instead undermines the very purpose of the program—to provide low income tenants with housing at rates that the applicable regulations have determined to be affordable.  The effect of such overcharging is illustrated by the case at hand, where Cummings and her children were ultimately forced to move out of the premises because she could not afford the excess utility payments Hale required her to pay—a harm of significantly greater magnitude than the dollar value of her utility bills.  *See* Cummings Decl. ¶ 14.  Perhaps on account of the destabilizing effect that overcharging tenants can have on a program intended to provide affordable housing, the HAP Contract here does not call for offsetting subsidies to account for side payments, but instead states that an owner who does not comply with all terms of the contract "does not have a right to receive housing assistance payments."  HAP Contract at 4, § 7(b).

In *Mackby*, the defendant therapist actually performed the physical therapy services for

United States District Court
Northern District of California

which he claimed reimbursement from Medicare.  *Mackby*, 339 F.3d at 1018.  The Ninth Circuit

addressed the appropriate measure of damages as follows:

> Mackby's false claims also harmed the government, in the form of
> both monetary damages *and harm to the administration and
> integrity of Medicare*.  The fact that Mackby's clinic actually
> performed the physical therapy for which he claimed reimbursement
> does not eliminate the government's injury.  Damages under the
> FCA flow from the false statement.  "Ordinarily the measure of the
> government's damages [under the FCA] would be the amount that it
> paid out by reason of the false statements over and above what it
> would have paid if the claims had been truthful." *United States v.
> Woodbury,* 359 F.2d 370, 379 (9th Cir. 1966).  The falsity here was
> not Mackby's representation that patients had received physical
> therapy, but the use of his father's PIN to obtain payments to which
> he was not entitled.  Had Mackby been truthful, the government
> would have known that he was entitled to *nothing* because he was
> neither a doctor nor a physical therapist in private practice.  In the
> legislative history to the FCA, Congress specifically rejected a "no
> harm, no foul" argument: "A false claim for reimbursement under
> the Medicare, Medicaid or similar program is actionable under the
> act, . . . and such claim[] may be false even though the services are
> provided as claimed if, for example, the claimant is ineligible to
> participate in the program . . . ." S. Rep. No. 99-345, at 9, *reprinted
> in* 1986 U.S.C.C.A.N. 5266, 5275.

*Id.* at 1018–19 (emphasis added).  Here, Hale's overcharging of Cummings harmed "the

administration and integrity of" the Section 8 program by undermining its purpose of providing

affordable housing, and "the government would have known that [Hale] was entitled to nothing" if

it had known she required Cummings to pay for utilities in violation of the HAP Contract.  The

undersigned therefore respectfully disagrees with the approach of *Coleman*, adopts the approach

of *Baran*, and bases damages under the FCA on the total amount of Section 8 payments that Hale

received while she was not in compliance with the HAP Contract.

    As discussed above in the context of civil penalties, Cummings resided at the premises in

question for twenty-four months.  For consistency with that analysis, the undersigned deems Hale

to have been in compliance with the HAP Contract for the final three months of Cummings's

tenancy, leaving twenty-one months at issue to determine damages.

    The lease provided that Cummings's rent was due on the first of each month.  Lease at 1,

§ 1.4.  An amendment to the HAP Contract effective July 1, 2014 indicates that the PHA provided

assistance payments of $1,850 per month before that date and $2,409 per month thereafter.  Hain

United States District Court
Northern District of California

United States District Court
Northern District of California

1  Decl. ¶ 14 & Ex. 11.  Accordingly, for the eleven rent payment dates before that amendment

2  became effective, at $1,850 per month, Hale would have received a total of $20,350.  The next

3  amendment in the record was effective July 1, 2015, and indicated that the PHA paid $2,434 per

4  month before that date and $1,683 per month thereafter.  *Id.* ¶ 16 & Ex. 13.  Cummings concedes

5  that without evidence of when the rate changed from $2,409 to $2,434 per month, the lower rate

6  should be used for the entire period.  Mot. at 27.  At $2,409 per month for the remaining ten

7  months that Hale was in violation of the HAP contract, Hale received a total of $24,090 for that

8  period.  Hale therefore received a grand total of $44,440 as a result of false claims to the Section 8

9  Program.  Trebling that amount pursuant 31 U.S.C. § 3729(a)(1), the undersigned recommends

10  that damages be assessed at $133,320.[10]

### c.  Total Liability and Relator's Share

12  Adding statutory penalties of $115,500 to treble damages of $133,320 results in total

13  liability under the FCA of $248,820.  A relator in a qui tam case where the United States does not

14  intervene is entitled to "not less than 25 percent and not more than 30 percent of the proceeds of

15  the action or settlement."  31 U.S.C. § 3730(d)(2).  Cummings submits an email from counsel for

16  the United States to her attorney stating that the United States does not object to Cummings taking

17  a thirty percent share of any proceeds of her FCA claim.  Hain Decl. ¶ 24 & Ex. 21.  The

18  undersigned therefore recommends awarding Cummings thirty percent of the total FCA liability,

19  resulting in a share of $74,646.

### d.  Attorneys' Fees and Costs

21  The FCA provides that a relator "shall also receive [from the defendant] an amount for

22  reasonable expenses which the court finds to have been necessarily incurred, plus reasonable

23  attorneys' fees and costs."  31 U.S.C. § 3730(d)(2).  Cummings requests attorneys' fees of

---

[10] Cummings requests total actual damages of $52,624, resulting in $157,782 after trebling.  Mot. at 27.  That total does not take into account the three months of compliance that Cummings conceded in the context of civil penalties due to the partial reimbursement of utility costs that she received.  *See id.* at 26−27.  Giving effect to Cummings's concession, the undersigned recommends that damages be based only on the first twenty-one months in which Hale received Section 8 payments.

18

1   $37,500.  Mot. at 27; Hain Decl. ¶¶ 29−35.[11]

2        Courts apply the lodestar method to determine reasonable attorneys' fees under federal fee-

3   shifting statutes.  *Carter v. Caleb Brett LLC*, 757 F.3d 866, 868 (9th Cir. 2014); *see, e.g.*, *Gonter*

4   *v. Hunt Valve Co., Inc.*, 510 F.3d 610, 616 (6th Cir. 2007) (applying the lodestar method to

5   calculate an award of fees for a successful FCA claim); *United States ex rel. Kim v. Mun*, No.

6   2:10-cv-01988-SVW-MAN, 2013 WL 12123970, at *8 (C.D. Cal. July 23, 2013) (describing the

7   lodestar method as "the prevailing method used by federal courts for calculating reasonable

8   attorneys' fees under 31 U.S.C. § 3730(d)(2)").  "Under this method, a district court must start by

9   determining how many hours were reasonably expended on the litigation, and then multiply those

10  hours by the prevailing local rate for an attorney of the skill required to perform the litigation.  The

11  district court may then adjust upward or downward based on a variety of factors."  *Moreno v. City*

12  *of Sacramento*, 534 F.3d 1106, 1111 (9th Cir. 2008) (citations omitted).  Potentially relevant

13  factors include, among others, "'whether the fee is fixed or contingent,'" "'the amount involved

14  and the results obtained,'" and "'the "undesirability" of the case.'"  *Carter*, 757 F.3d at 869

15  (quoting *Quesada v. Thomason*, 850 F.2d 537, 539 n.1 (9th Cir. 1988)).

16       Here, Cummings's attorney Jason Hain estimates that he spent a total of 100 hours

17  working on this case, consisting of: (1) approximately 40 hours meeting with Cummings,

18  gathering evidence, drafting the complaint, preparing a disclosure statement for the United States

19  Department of Justice, and coordinating with the United States as it decided whether to intervene;

20  (2) approximately 20 hours attending hearings, working with the United States Marshals Service

21  in its attempts to serve Hale, and preparing a motion for service by publication; and

22  (3) approximately 40 hours effecting service pursuant to the order granting permission to serve

23  Hale by publication, applying for entry of Hale's default, gathering evidence in support of default

24

25  ────────────────
    [11] The tally of Cummings's total requested award at the end of her motion includes attorneys' fees
26  of $753,111.70, reflecting her 40% contingency arrangement with her counsel as applied to total
    damages of $1,882,779.26.  Mot. at 29.  As Cummings identifies no authority for awarding
27  attorneys' fees in this manner, and the substantive discussion of a fee award in her motion instead
    uses the lodestar method to reach a requested award of $37,500, *see id.* at 27, the undersigned
28  disregards the far larger figure based on the contingency arrangement.

United States District Court
Northern District of California

United States District Court
Northern District of California

1   judgment, and preparing the present motion.  Hain Decl. ¶ 31; Hain Supp'l Decl. ¶ 10.  Although

2   greater specificity in an attorney's time records is generally useful in evaluating the

3   reasonableness of the time spent, the undersigned nevertheless concludes that 100 hours[12] is a

4   reasonable amount of time spent to litigate this action through default judgment, particularly given

5   the difficulty that Hain and Cummings encountered in attempting to serve Hale.

6         Hain states that his customary rate is $250 per hour, that this is "the reasonable market rate

7   for an attorney of [his] training and experience in the Bay Area," and that two judges of the

8   Alameda County Superior Court have approved fee awards based on this rate.  *Id.* ¶ 34.  Hain

9   graduated from the Golden Gate University School of Law and began practicing law in January of

10  2014.  *Id.* ¶ 33.  The undersigned takes judicial notice of California State Bar records indicating

11  that Hain was admitted to practice on January 30, 2014 and has no public record of discipline.[13]

12  Cummings's supplemental request for judicial notice includes three Superior Court orders

13  awarding Hain's previous clients attorneys' fees.  Supp'l RJN Ex. B.  Two of those orders

14  awarded fees as requested based on a rate of $250 per hour; the third noted that the total fee

15  request was "high for an unlawful detainer case" and rejected the request for a multiplier, but

16  awarded the full amount of fees actually incurred at a $250 per hour rate.  *Id.*  Robert Smith, an

17  attorney experienced in the field of rent-controlled tenancy litigation, states in a declaration that

18  "landlord-tenant attorneys in San Francisco routinely charge between $250 and $465 per hour for

19  their services," and that Hain's rate of $250 per hour is justified by Hain's federal practice

20  experience.  Smith Decl. ¶¶ 5−6.  The undersigned is satisfied that $250 is an appropriate billing

21  rate.

22        Cummings requests a multiplier of 1.5 to the lodestar figure for Hain's fees on the

23  following grounds: (1) qui tam cases based on Section 8 fraud are undesirable to attorneys, and

24  Hain is the only attorney in Northern California who takes such cases with regularity; (2) Hain is a

25

26  [12] As context, 100 hours represents only two weeks of a single attorney's undivided attention
27  working fifty hours per week.  This case has been pending for more than a year and a half.
    [13] State Bar of California, *Jason A. Hain - #295721*,
28  http://members.calbar.ca.gov/fal/Member/Detail/295721 (accessed May 17, 2017).

United States District Court
Northern District of California

sole practitioner who takes on significant risk representing low income clients on a contingency basis; and (3) prosecuting FCA cases serves a public good by recouping funds fraudulently obtained from the federal government. Mot. at 27; Hain Decl. ¶ 35. Under the circumstances of this case—in particular, the difficulty Section 8 tenants face obtaining counsel for claims of this type, the successful judgment recommended herein, and the substantial risk of nonrecovery given Hale's evasion of service and unknown location—the undersigned finds that the requested multiplier is warranted. The undersigned recommends that the request for a fee award of $37,500 be GRANTED.

Hain's declaration itemizes costs totaling $1,767: $32.25 for mailing, $1,714.75 to effect service by publication, and an estimated $20 for incidental costs including gasoline, parking, and printing. Hain Decl. ¶ 30. The undersigned finds these costs to be reasonable and well founded, and recommends that they be GRANTED in full. Cummings's motion also addresses costs that were waived as a result of her in forma pauperis status, including the filing fee for this action and the cost of service by the United States Marshals Service. *See* Mot. at 28. Because Cummings was not required to pay those costs, the undersigned recommends that the Court decline to include them in the judgment of this case.

### E.   Fraud and Penal Code Section 496

Cummings's argument in support of her motion for default judgment on claims of fraud and receiving stolen property under Penal Code section 496 reads, in full, as follows:

> California Civil Code Section 1572 defines fraud as "a promise made without any intention of performing it; or, any other act fitted to deceive." It is clear from the facts that Defendant insisted that Relator pay the property's utility bills immediately after signing the HAP Contract, that by signing the HAP Contract Defendant made a promise without intention of performing it.

> Penal Code § 496 provides for a civil cause of action in which the remedies are treble damages and attorney's fees. Penal Code § 496 applies to ordinary fraud situations. *Bell v. Feibush* (2013) 212 Cal.App.4th 1041. Thus, such remedies would be applicable to Relator's action to recover the fraudulently obtained side benefits.

Mot. at 17. Cummings does not address the elements of a claim for fraud under California law, which are "(a) misrepresentation (false representation, concealment or nondisclosure);

21

1  (b) knowledge of falsity (or 'scienter'); (c) intent to defraud, *i.e.*, to induce reliance; (d) justifiable

2  reliance; and (e) resulting damage." [14]  *Agosta v. Astor*, 120 Cal. App. 4th 596, 603 (2004); *see*

3  *also* Cal. Civ. Code § 1709 ("One who willfully deceives another with intent to induce him to alter

4  his position to his injury or risk, is liable for any damage which he thereby suffers.").

5         There is no allegation or evidence in this case that Cummings relied on any

6  misrepresentation by Hale.  To the extent that Cummings bases her fraud claim on Hale's

7  representations that Hale would pay for utilities in the HAP Contract, as suggested in Cummings's

8  present motion, it would be implausible to conclude that Cummings relied on such representations

9  given that she and Hale first signed the lease agreement (which does not state that Hale would pay

10  for utilities) on May 31, 2013—nearly two months before Hale and the PHA signed the HAP

11  Contract on July 26, 2013.  *See* Lease at 4; HAP Contract at 2.  It is conceivable that Cummings

12  relied instead on Request for Tenancy Approval, which also stated that Hale would pay for

13  utilities and which the parties signed on the same date as the lease, *see* Compl. Ex. A, but absent

14  any allegation or evidence that Cummings in fact relied on those representations in reaching her

15  decision to lease from Hale, the undersigned recommends that Cummings's motion for default

16  judgment be DENIED as to her claim for fraud. [15]  Because Cummings's only argument for her

17  claim under Penal Code section 496 is that that statute "applies to ordinary fraud situations," Mot.

18  at 17, the undersigned recommends that default judgment be DENIED as to that claim as well.

19  **F.    Civil Code Section 1942.4 and UCL**

20         **1.   Sufficiency of Claim**

21         Section 1942.4 of the California Civil Code provides that a "landlord of a dwelling may

22

23  _____

[14] Some courts enumerate a greater or lesser number of elements for the tort of deceit, but the
24  various sets of elements express the same concepts.  *See Manderville v. PCG & S Grp., Inc.*, 146
Cal. App. 4th 1486, 1498 & n.4 (2007).  Regardless, all formulations of the tort require justifiable
25  reliance by the plaintiff.  *See id.*
[15] Portions of the complaint suggest that Cummings intends to base her fraud claim on Hale's
26  fraud on the United States.  *See, e.g.*, Compl. ¶ 79 ("HALE or her agents intentionally
misrepresented facts and omitted disclosures with the intent to induce the Government to sign the
27  HAP Contract . . . .").  The appropriate vehicle for such a claim is the FCA, as discussed above.
Hale does not have standing to bring a claim for fraud on the United States under the California
28  Civil Code.

22

1    not demand rent [or] collect rent" if all of the following conditions are met: (1) the dwelling

2    violates standards set by statute, including those enumerated in section 1941.1 of the Civil Code;

3    (2) a "public officer . . . has notified the landlord or the landlord's agent in writing of his or her

4    obligations to abate the nuisance or repair the substandard conditions"; (3) the conditions have

5    persisted for at least thirty-five days since the landlord was notified of the violation; and (4) the

6    conditions were not cause by the tenant.  Cal. Civ. Code § 1942.4(a).  If a landlord violates this

7    statute, a tenant may recover her actual damages plus "special damages" of no less than $100 and

8    no more than $5,000.  *Id.* § 1912.4(b).

9         Here, the San Francisco Department of Building Inspection issued a notice of violation to

10   Hale for a sewage leak in the garage on October 10, 2013.  Hain Decl. ¶¶ 8−9 & Exs. 5−6.

11   Section 1941.1(a)(2) of the California Civil Code requires that "[p]lumbing or gas facilities . . .

12   [are] maintained in good working order."  Cal. Civ. Code § 1941.1(a)(2).  The notification of

13   sewage leak therefore served as a predicate for violation of section 1942.4.  The Department of

14   Building Inspection issued an abatement order in November of 2013.  Hain Decl. ¶ 9 & Ex. 6.  A

15   reinspection on December 11, 2015—several months after Cummings vacated the property—

16   showed that the violation had been corrected at that time.[16]  Although those records alone do not

17   demonstrate when the issue was resolved, Cummings states in her declaration that as of February

18   2015 "a problem with the plumbing had been causing the Subject Property to perpetually smell of

19   sewage," and that Hale "failed and/or refused to repair the conditions" she complained about,

20   which included the plumbing problems.  Cummings Decl. ¶¶ 11, 24.  In the context of a motion

21   for default judgment, the undersigned finds this evidence sufficient to show that the violation

22   persisted for the remainder of Cummings's tenancy.  There is no evidence that Cummings caused

23   the plumbing problem, and she states in her declaration she "did not cause or contribute to the

---

[16] Cummings requests judicial notice of a non-functional website address as evidence that the violation remained open as of January 2017.  *See* RJN at 2 (describing "Exhibit D" as what "one can see" at a specified URL).  The undersigned instead takes judicial notice of the public records available at
http://dbiweb.sfgov.org/dbipts/default.aspx?page=AddressComplaint&ComplaintNo=201329751 (accessed May 17, 2017).

1    substandard conditions described herein." *Id.* ¶ 23.  The undersigned therefore finds that all four

2    elements of section 1942.4 are satisfied, and that Hale violated that statute each time she collected

3    rent beginning thirty-five days after the notice of violation.

### 2.  Statute of Limitations

5         Under California law, "[a]n action upon a statute for a penalty or forfeiture" is subject to a

6    one-year statute of limitations.  Cal. Civ. Proc. Code § 340(a).  "Generally, section 340,

7    subdivision (a) applies if a civil penalty is mandatory."  *Shamsian v. Atl. Richfield Co.*, 107 Cal.

8    App. 4th 967, 978 (2003).  A statute that "provides a recovery in addition to the damages a

9    plaintiff might otherwise recover . . . is therefore penal" and subject to the one-year statute of

10   limitations.  *Id.*  Because section 1942.4 provides that a landlord is liable for "special damages"

11   beyond the tenant's actual damages, the undersigned recommends that Cummings's recovery

12   under this statute be limited to violations occurring within one year before she filed this action—

13   i.e., the occasions on which Hale collected rent after October 13, 2014.

### 3.  Damages

15        Under section 1942.4, Cummings is entitled to special damages of no less than $100 and

16   no more than $5,000 per violation, actual damages, and attorneys' fees.  Cal. Civ. Code

17   § 1942.4(b)(1), (2).  The undersigned finds that awarding attorneys' fees under this section would

18   be redundant to the fee award discussed above in the context of the FCA, but addresses the other

19   two categories of damages below.

20        Hale collected rent on nine occasions within the statute of limitations, with the first

21   collection on November 1, 2014 and the last on July 1, 2015.[17]  The undersigned agrees with

22   Cummings that each acceptance of rent constitutes a separate violation.  The undersigned further

23   agrees that the maximum "special damages" permitted by the statute are appropriate here in light

24   of the extensive period that the sewage issue persisted without remedy, the severity of the

---

[17] Absent specific evidence to the contrary, the facts that the shutoff of utilities in July of 2015 "caused [Cummings] to vacate at that time" and that Cummings removed her belongings from the premises by August 3, 2015 indicate that July of 2015 was likely the last month Hale collected rent from Cummings. *See* Cummings Decl. ¶¶ 14−15.  Cummings's motion asserts that she paid rent in August, but arguments in legal briefs are not evidence.

United States District Court
Northern District of California

1    habitability defects taken as a whole, and Hale's apparent refusal to engage in the City and County

2    of San Francisco's abatement process.  The undersigned therefore recommends that Cummings

3    recover special damages of $5,000 per violation, totaling $45,000 for the nine months during the

4    limitations period in which Hale collected rent.

5          Cummings also seeks to recover the rent she paid as actual damages under section 1942.4.

6    Mot. at 20−22.  She notes that courts in other jurisdictions have awarded Section 8 tenants rent

7    rebates based on the full monthly rent, without deducting the portion paid by a PHA, but concedes

8    that the Court may find that inappropriate here where the judgment already reflects the portion

9    paid by the PHA in the context of damages under the FCA.  *See id.*  The undersigned recommends

10   that Cummings's actual damages under section 1942.4 be limited to rent that she actually paid

11   when the statute dictated that it was unlawful for Hale to collect rent.

12         Cummings states in her declaration that she "fulfilled [her] obligations as a tenant at all

13   times," Cummings Decl. ¶ 23, which the undersigned accepts as evidence that Cummings paid all

14   rent required of her.  Amendments to the HAP Contract indicate that Cummings's share of the rent

15   was either $25 or $0 per month for the one-year period beginning July 1, 2014, and $751 per

16   month beginning on July 1, 2015.  Hain Decl. Exs. 11, 13.  Cummings concedes that without

17   evidence as to when the amount changed, the lower value of $0 per month should be applied to

18   that period.  Mot. at 22.  The only month in the limitations period in which Cummings paid rent[18]

19   was therefore July of 2015.  The undersigned recommends that Cummings recover actual damages

20   of $751 under section 1942.4, for a total recovery under this statute of $45,751.

21                **4.  Recovery of Rent Payments Under the UCL**

22         California's Unfair Competition Law (the "UCL") broadly prohibits "any unlawful, unfair

23   or fraudulent business act or practice."  Cal. Civ. Code § 17200.  "The UCL's 'unlawful' prong

24

25   [18] Although Cummings's own payment or nonpayment of rent is significant for actual damages,
     for the purpose of the "special damages" discussed above, the undersigned finds no basis to
26   distinguish between whether Hale collected rent from Cummings or from the Section 8 payments
     that the PHA made on Cummings's behalf.  So long as Hale received payment from some source
27   for Cummings's tenancy, she "collect[ed] rent" within the meaning of Civil Code section
     1942.4(a).
28

25

*United States District Court*
*Northern District of California*

United States District Court
Northern District of California

. . . 'borrows violations of other laws and treats them as unlawful practices that the unfair competition law makes independently actionable.'" *Beaver v. Tarsadia Hotels*, 816 F.3d 1170, 1177 (9th Cir. 2016) (quoting *Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.,* 20 Cal. 4th 163, 180 (1999)).  The UCL has a four-year statute of limitations, and "as a general matter, the UCL statute of limitations will apply to a UCL claim, even when that claim is based on an underlying law with its own separate statute of limitations." *Id.*  Although the UCL does not authorize an action for damages, it does allow a plaintiff to recover through restitution "money or property obtained from the plaintiff . . . through unfair or unlawful business practices." *Cortez v. Purolator Air Filtration Prods. Co.*, 23 Cal. 4th 163, 173 (2000); *see also id.* at 177 (concluding that wrongfully withheld wages may be awarded as restitution under the UCL).

Here, Hale's collection of rent for Cummings's tenancy became unlawful under section 1942.4 starting on November 14, 2013—thirty-five days after the notice of violation on October 10, 2013.  Her continued collection of rent after that date therefore violated section 1942.4 and was "unlawful" for the purpose of the UCL.  Based on amendments to the HAP Contract, Cummings's portion of the rent was $584 per month before July 1, 2014, and $25 or $0 (deemed $0 pursuant to Cummings's concession) per month for the one-year period beginning thereafter. *See* Hain Decl. Exs. 11, 13; Mot. at 22.  Cummings therefore paid $584 per month for December of 2013 through June of 2014—a total $4,672 over eight months.  The undersigned recommends that default judgment be GRANTED on Cummings's UCL claim in that amount.

### G.    San Francisco Administrative Code Claims

#### 1.  Sufficiency of Claim

Under section 37.10B of the San Francisco Administrative Code, a landlord may not, *inter alia*:

> (2) Fail to perform repairs and maintenance required by contract or by State, County, or local housing, health or safety laws;
>
> . . .
>
> (10) Interfere with a tenant's right to quiet use and enjoyment of a rental housing unit as that right is defined by California law; [or]
>
> . . .

1

> (15) [Engage in o]ther repeated acts or omissions of such significance as to substantially interfere with or disturb the comfort, repose, peace or quiet of any person lawfully entitled to occupancy of such dwelling unit and that cause, are likely to cause, or are intended to cause any person lawfully entitled to occupancy of a dwelling unit to vacate such dwelling unit or to surrender or waive any rights in relation to such occupancy.

S.F. Admin. Code § 37.10B(a).  Any person may bring a civil action to enforce this ordinance, and landlord who violates the ordinance is liable for "money damages of not less than three times actual damages suffered by an aggrieved party (including damages for mental or emotional distress)," although "an award of damages for mental or emotional distress . . . shall only be trebled if the trier of fact finds that the landlord acted in knowing violation of or in reckless disregard of Section 37.9, 37.10A, or 37.10B" of the Administrative Code.  *Id.* § 37.10B(c)(3), (5).

Due to its mandatory treble damages provision, this ordinance is subject to the one-year statute of limitations of section 340(a), discussed above in the context of Cummings's section 1942.4 claim.  *See Sylve v. Riley*, 15 Cal. App. 4th 23, 26 (1993) (holding that the analogous "mandatory treble damages provision of San Francisco Administrative Code section 37.9, subdivision (f) brings this action within the one-year statute of limitations").  The undersigned therefore once again looks to Hale's conduct in the period from October 13, 2014 (one year before Cummings filed this action) until Cummings vacated the premises.

Cummings complained to Hale about sewage smells, insects, and rodents "[w]ithin six months of taking up occupancy," meaning no later than January of 2014.  Cummings Decl. ¶ 10.  The ceiling of the storage unit collapsed due to water intrusion in April of 2014, and Cummings complained to Hale about that as well.  *Id.*  Hale did not remedy any of these habitability defects.  *See id.* ¶¶ 10, 11, 24.  Based on these facts, the undersigned finds that Hale was aware of the habitability defects at all times during the limitations period for a claim under section 37.10B, and that her failure to remedy them constituted "repeated acts or omissions of such significance as to substantially interfere with or disturb the comfort, repose, peace or quiet of" Cummings.  *See* S.F. Admin. Code § 37.10B(a)(15).  Moreover, Cummings ultimately vacated the unit because "the vermin infestation became excessively rampant" after electricity service was disconnected.  Cummings Decl. ¶ 14.  Hale's failure to remedy the rodent and insect infestation therefore

United States District Court
Northern District of California

1    "cause[d Cummings] . . . to vacate [the] dwelling unit." *See* S.F. Admin. Code § 37.10B(a)(15).

2    The undersigned also finds that failure to remedy sewage leaks and a collapsed ceiling over a

3    period of more than a year would be "likely to cause . . . any person lawfully entitled to occupancy

4    of a dwelling unit to vacate such dwelling unit." *See id.*  Hale's inaction therefore constitutes a

5    violation of subpart (a)(15) of section 37.10B; the Court need not address whether it also satisfies

6    other subparts of the ordinance.

7              **2.  Damages**

8              Cummings seeks several categories of damages under section 37.10B: (1) personal injury

9    damages of $5,000 for mold exposure and exposure to sewage smells, Mot. at 19; (2) emotional

10   distress damages of $50,000 for the "apprehension and discomfort associated with living in a

11   contaminated environment and forced into homelessness," *id.* at 20; (3) damages for loss of a rent-

12   controlled unit for an estimated twenty years, totaling $255,840, *id.* at 22−23; (4) damages for the

13   future value of her Section 8 voucher—which was terminated after she was unable to find another

14   qualifying apartment—over the 127 months until her youngest child will be twenty years old, at

15   which point Cummings expects to be able to afford her own rent, totaling $213,741, *id.* at 23−24;

16   (5) costs associated with vacating, totaling $8,382, *id.* at 25; (6) medical bills totaling $3,000 for

17   Cummings's daughter's respiratory ailments resulting from contamination at the premises, *id.* at

18   25−26; (7) and wrongful withholding of Cummings's $3,500 security deposit, *id.* at 26.

19              a.  Damages During the Tenancy

20              Of the categories of damages listed above, Cummings's claimed personal injury damages,

21   emotional distress damages, and medical bills accrued over the full course of the tenancy due to

22   the habitability defects discussed above.  The Court therefore must determine not only whether

23   they are supported by evidence, but also whether they occurred during the one-year statute of

24   limitations for a claim under section 37.10B.

25              i.  Personal Injury

26              Cummings claims personal injury damages of $5,000 for exposure to mold and to the smell

27   of sewage.  Mot. at 19.  In her declaration, she states that she first complained about sewage smells

28   "within six months after taking up occupancy" and that Hale did not adequately remedy any of the

28

defects, Cummings Decl. ¶¶ 10, 24, which indicates that Cummings experienced sewage smells for about eighteen months of her tenancy.  Although Cummings identifies no evidence that she suffered personal injury to herself as a result of mold exposure, the undersigned finds $5,000 to be a reasonable measure of damages for exposure to the smell of sewage in one's home for a period of eighteen months.  Of those eighteen months, however, only about ten months—just over half of the exposure period—fell within the limitations period for a section 37.10B claim.  The undersigned finds that Cummings suffered $2,750 worth of personal injury damages during the limitations period, and recommends that she recover $8,250 as treble damages.

### ii.  Emotional Distress

Cummings bases her emotional distress damages in part on conditions during the tenancy, including living in a home that fell far below habitability standards and "witnessing her children's declining health."  Cummings Decl. ¶ 17.  She also states that she and her children became homeless when they vacated the apartment, and that they have since "awkwardly resid[ed] . . . at the home of the father of [her] children with whom [she has] been estranged for many years."  *Id.* ¶ 18.  The undersigned finds Cummings's total figure of $50,000 to be reasonable and well founded for the emotional distress that she has suffered.  *See* Mot. at 20.  Since only a portion of that distress accrued over the course of her tenancy, with much of it occurring as a result of her eviction, the undersigned finds that Cummings incurred emotional distress damages of $40,000 during the limitations period.  The undersigned also finds the evidence in this case—in particular, Hale's apparent disregard of violation notices and abatement orders by the Department of Building Inspection—sufficient to show that Hale acted "in reckless disregard of" San Francisco tenant protection ordinances, and recommends that Cummings recover $120,000 as treble damages for emotional distress.  *See* S.F. Admin. Code § 37.10B(c)(5).

### iii.  Medical Expenses

As for medical expenses, although Cummings states in her declaration that she "suffered . . . economic damage from being forced to bring [her] daughter to the hospital," there is no evidence in the record from which to determine a value of those damages.  *See* Cummings Decl. ¶ 17.  The medical records for Cummings's daughter K.C. do not include any cost or billing

1    information.  *See* Hain Decl. Ex. 19.  Cummings's counsel's estimate of $3,000 in medical

2    expenses is neither itself cognizable evidence nor supported by any citation to evidence in the

3    record.  *See* Mot. at 25−26 (conceding that Cummings's "medical bills are not in her possession").

4    On this record, the undersigned finds the amount of any medical expenses that Cummings incurred

5    too speculative to support an award of damages.

6                   b.  Damages as a Result of Constructive Eviction

7            The remaining categories of damages resulted from Cummings being forced to vacate the

8    premises.  These damages do not implicate the statute of limitations, because Cummings filed this

9    action only a few months after vacating, but must still be supported by evidence.

10                  i.  Loss of Rent-Controlled Unit

11           Cummings seeks loss of use damages for twenty years based on the difference between the

12   rent during her tenancy, was protected from increases by San Francisco's rent control ordinance,

13   and the market rate for a comparable unit.  *See* Mot. at 22−23.  In *Chacon v. Litke*, a California

14   appellate court affirmed a judgment that incorporated the net present value of twenty years of

15   future tenancy, trebled pursuant to section 37.9(f) of the San Francisco Administrative Code for

16   total economic damage of more than one million dollars.  *Chacon v. Litke*, 181 Cal. App. 4th

17   1234, 1246 (2010).  In *Castillo v. Friedman*, the appellate division of a California Superior Court

18   discussed the appropriate measure of damages for wrongful eviction, holding that a court should

19   look to the difference between the plaintiff's rent-controlled rate and the market rate for the unit,

20   which in that case was established by the rent that subsequent tenant agreed to pay for the same

21   unit.  *Castillo v. Friedman*, 197 Cal. App. 3d Supp. 6, 19−21 (App. Div. Super. Ct. 1987).  Here,

22   the evidence shows that the total rent for the premises was $2,434 per month, and did not change

23   over the course of Cummings's tenancy.  Hain Decl. Exs. 11, 13.  Although San Francisco's rent

24   ordinance normally allows for limited increases to rent based on inflation, it exempts Section 8

25   tenants from such increases.  S.F. Admin. Code § 37.3(a)(1), (2), (10)(B).  Cummings does not

26   identify evidence of the rental rate that any subsequent tenant paid for the unit.

27           Cummings submits evidence in the form of an estimate from a real estate website that the

28   market rent for the unit would be $3,500 per month.  Hain Decl. Ex. 20.  The undersigned finds

United States District Court
Northern District of California

1    this evidence insufficient.  The screen capture that Cummings submits does not appear to take into

2    account factors including the numbers of bedrooms in the house—it lists the house as "-- beds,"

3    using an apparent placeholder for lack of information—or the fact that Cummings did not occupy

4    the entire house, but instead only the portion that had not been divided into the illegal second unit.

5    *See id.*  Moreover, an increase in market rent of more than $1,000 per month, or more than forty

6    percent, over the course of Cummings's two-year tenancy would be drastic even in a competitive

7    rental market;[19] the suggestion of such an increase calls for more concrete evidence than

8    Cummings has provided.

9        Cummings attempts to remedy that lack of evidence through her supplemental

10   submissions.  She requests that the Court take judicial notice of a real estate website's calculation

11   that the median rent for a three-bedroom apartment in the Bayview district of San Francisco is

12   $4,000 per month.  Supp'l Br. at 7; Supp'l RJN Ex. A; Hain Supp'l Decl. ¶ 6.  But there is no

13   evidence from which to determine how the unit at issue here compares to the median three-

14   bedroom apartment in that area.

15       Richard Devine, an expert retained by Cummings, states in a two-paragraph declaration

16   that the market rate for the unit is $3,977 per month, "based on the rents authorized by HUD for

17   three bedroom units at [two apartment complexes] in the Bayview."  Devine Decl.  According to

18   Devine, single-family units like the one at issue—apparently not accounting for the illegal second

19   unit and the fact that Cummings never occupied the entire house—"typically command a higher

20   value" than multifamily complexes like the comparison properties that he cites.  *Id.*  It is not clear

21   from Devine's declaration what the actual rental rates are at the comparison properties, whether

22   Devine's estimate for the unit at issue includes an increase based on its purported status as a

23   single-family home, or if so, how much of an increase he applies to reach that figure.  It is also not

24   clear whether Devine knew or considered any information about the unit at issue other than the

25

26   [19] The undersigned notes that Cummings's expert Richard Devine states that rental rates in the
     Bayview district have increased by "close to 12%" in the past year, which he characterizes as
27   "intense" pressure on housing inventory.  Devine Decl.  An increase of twelve percent per year
     would be significantly lower than the forty percent increase that Cummings claims over her two-
28   year tenancy.

number of bedrooms and its purported single-family status in reaching his conclusion.  Although the undersigned does not dispute Devine's experience in the field, it is not possible on this record to tell what methods he used to reach his estimate and whether those methods are reliable.

In the absence of better evidence of the market rent for the unit—not only at the present time, but over the course of Cummings's expected tenancy had she not been constructively evicted, and accounting for the net present value of such future damages, *cf. Chacon*, 181 Cal. App. 4th at 1246—the undersigned concludes that the record before the Court is not sufficient to prove the amount of damages suffered by Cummings as a result of the loss of a rent-controlled unit.

### ii.  Loss of Section 8 Voucher

Cummings also seeks damages for the loss of her status as a Section 8 beneficiary.  Mot. at 23−24.  In September of 2016, the PHA informed her that she was no longer eligible for benefits because she had not found a new housing provider willing to accept Section 8 subsidies within the time limit to do so, and that she would need to wait years to reenroll in the program.  Cummings Decl. ¶ 19.  Her motion asserts, without citation to evidence, that if she had not been forced to vacate her former home she would have remained eligible for benefits until her youngest child reached the age of twenty in March of 2027, and assumes that her benefits would remain at $1,683 per month, the amount she was receiving when she was constructively evicted.  Mot. at 24 (citing Hain Decl. Ex. 13 for the rate of Cummings's monthly benefits).  The undersigned finds this approach overly speculative.  Cummings's benefits fluctuated significantly over the course of her tenancy: from $1,850 per month, to $2,409 per month, to $2,434 per month, to $1,683 per month. Hain Decl. Exs. 11, 13.  Although Cummings contends that using $1,683 per month to determine damages going forward is a conservative estimate because it was her lowest rate of benefits during the period at issue and because it is well below the maximum subsidy that the PHA would pay for a three bedroom unit, there is no evidence in the record to support the conclusion that Cummings would continue to receive benefits at that level.  In the absence of evidence to the contrary, the trend of Cummings's benefits decreasing at the end of her tenancy (presumably due to an increase in income) might well continue in future years.  Moreover, Cummings's counsel stated at the

32

hearing that Cummings's Section 8 status has, unexpectedly, been reinstated, and that she might be able to benefit from the program going forward if she is able to find a participating rental unit.

The 2015 amendment to the HAP Contract indicates that, if she had remained in the unit, Cummings's benefits would have remained at $1,683 per month until July of 2016.  Hain Decl. Ex. 13.  This is sufficient evidence to determine that Cummings lost the benefit of eleven months[20] of subsidies at that rate due to her constructive eviction, for a total of $18,513.  Trebling that amount pursuant to section 37.10B, the undersigned recommends that Cummings recover $55,539 for this category of damages.  On the record available, however, the undersigned finds Cummings's potential Section 8 benefits beyond that point too speculative to support any further damages.

### iii.  Costs of Vacating

Cummings states in her declaration that she paid $300 to hire a moving truck, $200 to hire movers, and $299 per month after vacating the apartment for a storage unit, and that she was forced to discard $2,500 worth of belongings damaged or contaminated by the habitability defects at issue.  Cummings Decl. ¶ 15.  The undersigned finds this statement to be sufficient evidence that Cummings incurred these costs as a result of her constructive eviction and Hale's failure to remedy the habitability defects of the premises.  Approximately eighteen months elapsed between when Cummings removed her belongings from the unit and the date of her declaration, resulting in total storage costs of $5,382, and thus total costs and losses of $8,382.  Trebling that figure pursuant to section 37.10B, the undersigned recommends that Cummings recover $25,146 for this category of damages.

### iv.  Security Deposit

Cummings states in her declaration that Hale failed to return her $3,500 security deposit. Cummings Decl. ¶ 16.  Her present motion asserts, without meaningful analysis, that this withholding is subject to treble damages under section 37.10B.  Mot. at 26.  In the absence of authority to the contrary, however, the undersigned concludes that the failure to return

---

[20] August of 2015 through June of 2016.

Cummings's security deposit after she vacated is a distinct injury from the harassment and constructive eviction governed by section 37.10B.  The security deposit is therefore addressed separately below, in the context of section 1950.5 of the California Civil Code.

### c.  Total Damages Under Section 37.10B

For the reasons discussed above, the undersigned recommends that Cummings recover treble damages of $8,250 for personal injury, $120,000 for emotional distress, $55,539 for loss of eleven months of Section 8 benefits, $25,146 for property damage and costs associated with vacating the unit.  In total, the undersigned therefore recommends that Cummings recover $208,935 under section 37.10B's treble damages provision.

## H.    Negligence

Cummings's arguments in support of her negligence claim largely overlap with the conduct discussed above in the context of section 37.10B.  *See* Mot. at 10.  The undersigned does not recommend awarding redundant damages under this theory.  As discussed above, however, the undersigned recommends that Cummings not recover $2,250 of her personal injury damages and $10,000 of her emotional distress damages under section 37.10B due to the one-year statute of limitations applicable to that ordinance.  The statute of limitations for personal injury claims outside the context of a penalty statute like the San Francisco ordinance, however, is two years. Cal. Civ. Proc. Code § 335.1.  Cummings may therefore be able to recover under her negligence claim for injuries dating to October of 2013, encompassing essentially the full period from the onset of the habitability defects until she vacated the premises.

Under California law, on appropriate facts, "a tenant may state a cause of action in tort against his landlord for damages resulting from a breach of the implied warranty of habitability." *Stoiber v. Honeychuck*, 101 Cal. App. 3d 903, 918−19 (1980).  California courts have long "applied the ordinary rules of negligence to actions for damages between landlords and tenants." *Evans v. Thomason*, 72 Cal. App. 3d 978, 984 (1977).  A reasonably prudent landlord would resolve sewage malfunctions and infestations of insects and rodents when those issues were brought to her attention, and certainly after receiving a notice of violation from a city buildings department.  The undersigned recommends that Cummings's motion be GRANTED as to her

34

negligence claim, and that she recover the $2,250 of personal injury damages excluded from the section 37.10B claim above.

Cummings's motion does not adequately address the standard for awarding emotional distress damages on a negligence theory, nor does it address in any way the intentional infliction of emotional distress claim included in her complaint. The undersigned recommends that the Court decline to award Cummings emotional distress damages incurred outside of the one-year statute of limitations for her section 37.10B claim.

## I.   Civil Code Section 1950.5

Section 1950.5(*l*) of the California Civil Code provides that where a landlord fails to return a tenant's security deposit in bad faith, the tenant may recover "damages of up to twice the amount of the security, in addition to actual damages." Cal. Civ. Code § 1950.5(*l*). Here, the only evidence in the record indicates that although Cummings "did not cause or contribute to the substandard conditions" of the property and "fulfilled [her] obligations as a tenant at all times," Hale nevertheless did not return Cummings's $3,500 security deposit after she vacated. Cummings Decl. ¶¶ 16, 23; *see also* Lease at 1 (indicating that Cummings provided a $3,500 security deposit at the beginning of her tenancy). In the absence of countervailing evidence, the undersigned finds these facts sufficient to infer Hale's bad faith in withholding the security deposit, and recommends that Cummings recover her actual damages of $3,500, plus additional damages of $7,000 for bad faith under section 1950.5(*l*), for a total recovery of $10,500.

## J.   Remaining Claims

Cummings's motion does not appear to pursue the claims asserted in her complaint for improper utility metering in violation of California Civil Code section 1940.9 (Compl. ¶¶ 138−40), breach of contract (*id.* ¶¶ 146−50), unlawful rent increase in violation of San Francisco Administrative Code section 37.3 (*id.* ¶¶ 155−60), recovering possession of a rental unit in violation of San Francisco Administrative Code section 37.9 (*id.* ¶¶ 109−14), or intentional infliction of emotional distress (*id.* ¶¶ 115−17). To the extent it could be construed as seeking default judgment on those claims, the undersigned recommends that it be DENIED for failure to demonstrate Cummings's entitlement to relief.

1    The remaining claims discussed in Cummings's motion and not addressed above—breach

2    of the implied warranty of habitability (Mot. at 10−12), nuisance (*id.* at 14), breach of the

3    covenant of quiet enjoyment (*id.* at 15), breach of the covenant of good faith and fair dealing (*id.*),

4    and common law constructive eviction (*id.* at 15)—are generally redundant to the claims discussed

5    above, and provide no broader avenue for relief.  The undersigned recommends that default

6    judgment be DENIED as to those claims as well.

7    **IV.    CONCLUSION**

8    As discussed above, the undersigned recommends that the United States recover $174,174

9    under the FCA, and that Cummings recover: (1) a qui tam share of $74,646 under the FCA, as

10   well as attorneys' fees of $37,500 and costs of $1,767; (2) $45,751 under Civil Code section

11   1942.4; (3) $4,672 under the unlawful prong of the UCL; (4) $208,935 under San Francisco

12   Administrative Code section 37.10B; (5) $2,250 on her claim for negligence; and (6) $10,500

13   under Civil Code section 1950.5(*l*).  The undersigned therefore recommends that Cummings's

14   motion be GRANTED in part and DENIED in part, and that judgment be entered against Hale in

15   favor of the United States in the amount of $174,174 and in favor of Cummings in the amount of

16   $386,021.

17   Dated: May 17, 2017

18   _____

19   JOSEPH C. SPERO
     Chief Magistrate Judge

*United States District Court*
*Northern District of California*